1  Alex R. Straus (SBN 321366)
2  **GREG COLEMAN LAW PC**
   16748 McCormick Street
3  Los Angeles, CA 91436
   T: 917-471-1894
4  alex@gregcolemanlaw.com

5  *Attorneys for Plaintiff*

6  *[Names and addresses of additional Counsel for Plaintiffs on Signature Page]*
7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10  THOMAS MATTHEWS, *individually and*
11  *on behalf of all others similarly situated,*
                                                    Case No. _____
12              Plaintiff,
        v.
13                                                  **CLASS ACTION COMPLAINT**
    RECKITT BENCKISER LLC and
14  RB HEALTH (US) LLC,                             **JURY TRIAL DEMANDED**
15
                Defendants.
16

17

18       Plaintiff Thomas Matthews ("Plaintiff"), by and through undersigned counsel, and on behalf

19  of himself and all others similarly situated, alleges as follows against Defendants Reckitt Benckiser

20  LLC and RB Health (US) LLC (collectively, "Defendants"), based upon personal knowledge as to

21  himself and his own acts and experiences and, as to all other matters, upon information and belief,

22  including investigation conducted by his attorneys:

23                          **INTRODUCTION**

24       1.     Defendants Reckitt Benckiser LLC ("RB") and RB Health (US) LLC ("RB Health")

25  designed and now manufacture, market, advertise, and sell Neuriva Original and Neuriva Plus,

26

27  purported brain performance supplements.

28
                                1                    CLASS ACTION COMPLAINT

2.      It is no secret that brain health and cognitive performance are issues of concern to consumers of all ages and are important public health issues.  It is, therefore, no surprise that products promising improved brain performance, including improved memory and focus, are widely available in stores across the United States.[1]

3.      In 2016, dietary supplements claiming to benefit the brain generated $3 billion in global sales.[2]  Brain health supplements are forecast to increase to $5.8 billion in sales by 2023.[3]

4.      In order to capitalize on the ballooning and lucrative brain health supplement market, Defendants raced to bring Neuriva Original and Neuriva Plus (collectively, "Neuriva" or the "Neuriva Products") to market in April 2019, promoting Neuriva to the public as a dietary supplement that is "clinically proven" to fuel "brain performance." Neither of these statements is true.  Defendants have engaged in such deceptive conduct in order to compete in the saturated brain health supplement market, which is driven by consumers' deep concern about this issue, which has in turn increased demand for brain health supplements across the United States.

5.      In their efforts to exploit this market, Defendants have engaged in a uniformly deceptive advertising and marketing campaign including the product label and packaging, Defendants' website, and other marketing materials, trumpeting that "science proved" that Neuriva's ingredients provide brain-performance benefits to all consumers who use them. According to Defendants' repeated statements in their advertising, marketing, and labeling, Neuriva's ingredients are "backed by science" and "clinically proven" to improve consumers' focus, accuracy, memory, learning, and concentration.

---

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7153641/
[2] *Global Council on Brain Health*, "The Real Deal on Brain Health Supplements: GCBH Recommendations on Vitamins, Minerals, and Other Dietary Supplements," p. 2 (2019) ("*Global Council on Brain Health*").  Available at:
 www.GlobalCouncilOnBrainHealth.org.DOI:https://doi.org/10.26419/pia.00094.001.
[3] *Id.* p. 2.

2          CLASS ACTION COMPLAINT

6.    In fact, on the front of the Neuriva Products' packaging, Defendants tout that Neuriva contains "Clinically Proven Natural Ingredients" that improve brain performance in the areas of Focus, Memory, Learning, Accuracy, Concentration, and Reasoning.

7.    Similarly, on the top label of the Neuriva Products' packaging, Defendants state in bold letters: "It's time to brain better."  And, on the side of the product packaging, Defendants state: "Nature made it.  Science proved it.  Brains love it.  Our natural ingredients are GMO-free and clinically proven to enhance brain performance."

8.    To further promote their uniform message that Neuriva is clinically proven to enhance brain performance, on the front of the Neuriva Product packages, Defendants include a large picture of a brain, where it cannot be missed by consumers:



CLASS ACTION COMPLAINT



9. Defendants' representations are designed to induce consumers to believe that Neuriva has been proven as a matter of fact to provide meaningful brain performance benefits. And consumers purchase Neuriva solely for the purpose of obtaining these purported brain performance benefits.

10. The highly trumpeted active ingredients in Neuriva are Coffee Cherry Extract (also called "Neurofactor") and Soy-based Sharp PS (Phosphatidylserine), both of which Defendants state are "clinically proven to enhance brain performance."

11. In reality, Defendants have no scientific or clinical proof that Neuriva provides any benefit to the brain or that its key advertised ingredients can actually access the brain in sufficient amounts—or in *any* amount—to provide meaningful brain performance benefit. Defendants' promises about Neuriva and their representations about Neuriva's key ingredients are simply false or, in some instances, disturbingly misleading.

4        CLASS ACTION COMPLAINT

12.     Indeed, as the Global Council on Brain Health, a blue-ribbon collaborative panel, has emphasized: "Despite claims to the contrary, brain health supplements have not been established to maintain thinking skills or improve brain function."[4]

13.     In an effort to achieve maximum profits, Defendants have capitalized on consumers' focus on brain health and performance and fears of cognitive decline.

14.     Plaintiff brings this action individually and on behalf of all other similarly situated consumers to halt the dissemination of Defendants' fraudulent and misleading representations, to correct the false and misleading perceptions that Defendants have created in the minds of consumers, and to obtain redress for those who have actually purchased Neuriva.

## PARTIES

15.     Plaintiff Thomas Matthews is a resident and citizen of Modesto, California in Stanislaus County, California.

16.     Defendants RB and RB Health are Delaware corporations with their principal places of business located in Parsippany, New Jersey. Defendants' corporate parent is a British multinational company traded on the London Stock Exchange that reported net revenue of over £12.8 billion in 2019 alone. Its brand portfolio includes, among others, Mucinex, Clearasil, Lysol, Air Wick, and Woolite.

17.     In 2012, Defendant RB paid $1.4 billion to merge with Schiff Nutrition International, Inc. Schiff Nutrition was founded in 1936 as a small supplement company and grew into a multimillion-dollar vitamin and nutritional supplement company. RB's acquisition of Schiff Nutrition allowed it to join the multibillion-dollar vitamins, minerals, and supplements market.

---

[4] *Id.* at 20.

CLASS ACTION COMPLAINT

18.     Neuriva is a registered trademark of RB Health, and RB Health holds the copyrights for the Neuriva Product labeling and for the website through which Neuriva is marketed.  RB Health also distributes the Neuriva Products and is identified as the manufacturer on Amazon.

19.     Defendants manufacture, advertise, market, distribute, and/or sell the Neuriva Products to consumers in California, the Eastern District of California, and throughout the United States.

## JURISDICTION & VENUE

20.     This Court has general personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privilege of doing business within the State of California, including within this District; have had continuous and systematic general business contacts within the state, including within this District; and can be said to have reasonably anticipated being haled into court in this forum.

21.     This Court has specific personal jurisdiction over Defendants because this action arises out of and relates to Defendants' contacts with this forum. Specifically, Defendants knowingly directed the Neuriva Products through the stream of commerce into this District. Defendants have advertised and marketed within this District through the wires and mail and via e-commerce websites through which residents of this state and District can purchase the Neuriva Products. Further, Defendants knowingly direct electronic activity into this state and District with the intent to engage in business interactions and have in fact engaged in such interactions. Moreover, Defendants' website directs each consumer to purchase Neuriva "at your local retailer," including Walgreens, Walmart, CVS, Kroger, and Rite Aid, all of which have one or more locations in this District.

22.     This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil

action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Plaintiff is diverse from Defendants, and the matter in controversy exceeds $5,000,000.00 in the aggregate, exclusive of interest and costs. Finally, "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

23.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District. Plaintiff purchased Neuriva in this District and incurred losses in this District. Numerous other Class members also purchased the Neuriva Products in this District. Defendants caused the Neuriva Products to be offered for sale and sold to the public, including to Plaintiff, in this District.

24.     Venue is proper pursuant to 28 U.S.C. § 1391(c)(2) because this Court maintains personal jurisdiction over Defendants.

## ADDITIONAL FACTUAL ALLEGATIONS

### Sales of Neuriva Products

25.      Neuriva, which Defendants raced to market in only 12 months, is a growing leader in the brain supplement industry.  Neuriva is now an Amazon best seller.

26.     The Neuriva Product line includes two formulas—Neuriva Original and Neuriva Plus—both of which contain coffee fruit extract and soy-based phosphatidylserine as active ingredients.

27.     Neuriva Original contains the following ingredients:



28.     Neuriva Plus contains the following ingredients:



29.     Defendants sell Neuriva online through their website, schiffvitamins.com, and in stores nationwide, including Walgreens, Walmart, CVS, Rite Aid, Sam's Club, Target, and others, as well as on Amazon.

30.     Since Defendants first started selling Neuriva, they have uniformly and continuously represented, on both product packaging and in product advertising, that Neuriva enhances brain health and performance.

8          CLASS ACTION COMPLAINT

31.     Defendants' representations appear, among other places, on the Neuriva Product label and packaging; in television commercials; on Defendants' web pages; in other online vending and marketing forums including sponsored videos on YouTube; and in product pamphlets and other literature distributed by Defendants.

32.     Although Neuriva comes in two formulas, each formula is substantially similar to the other in form and in purported function and both are sold in substantially similar packages, with similar labels, making similar claims and including similar instructions, as can be seen throughout this Complaint.

33.     The omissions and misrepresentations identified in this Complaint are virtually identical across both formulations and the claims that form the basis of this action would be the same in all essential respects regardless which formula is considered. That is to say, the formulas are substantially similar and the means of deception is the same for both.

34.     Defendants' misrepresentations fall into two categories: (1) Defendants make health claims (e.g., enhanced brain performance) that are actually false, and (2) Defendants affirmatively represent that Neuriva's purported beneficial effects are scientifically established (e.g., clinically proven).  Both categories of representations are false and/or misleading.

35.     Defendants intend for consumers to rely upon Defendants' representations concerning the Neuriva Products' brain health benefits and Defendants' claims that the Neuriva Products' ingredients are scientifically and clinically proven.

36.     It is reasonable for consumers to rely upon Defendants' representations concerning the Neuriva Products when deciding to purchase Neuriva Products.

37.     Defendants' representations concerning the Neuriva Products' brain health benefits were developed with the intent to generate sales of the Neuriva Products.

**<u>Defendants' Representations about the Neuriva Products</u>**

38.    Defendants have made uniform, express and implied representations concerning the benefits of the Neuriva Products. These representations include claims that the Neuriva Products are scientifically and clinically proven to improve brain function in specified ways and that oral consumption of the Neuriva Products will result in improved brain function.

39.    Defendants' express and implied representations concerning the Neuriva Products' brain performance capabilities are uniform and pervade Defendants' marketing.

40.    The exterior of the Neuriva Original packaging claims that it has "clinically proven natural ingredients" and claims that the supplement "Fuels 5 indicators of brain performance" and lists the following: Focus, Memory, Learning, Accuracy, and Concentration. The label on the bottle itself states that it is "CLINICALLY PROVEN."



41.    The side of the Neuriva Original packaging elaborates on what Defendants claim the supplement will do as a matter of fact: "Our natural ingredients are GMO-free and clinically

CLASS ACTION COMPLAINT

proven to enhance brain performance." Regarding Neuriva Original's first main active ingredient, coffee cherry extract (which its ingredient list identifies as coffee fruit extract), Defendants claim on their packaging that it is "clinically proven to increase levels of the vital neuroprotein BDNF, known to strengthen connections between brain cells." Regarding its second main active ingredient, phosphatidylserine, Defendants claim on the packaging that "[t]hese plant-sourced phospholipids make up the structure of neurons within the brain. Clinically proven to aid neuron health and fuel memory and learning ability." Defendants prominently display on the packaging Neuriva's tagline: "Nature made it. Science proved it. Brains love it."



CLASS ACTION COMPLAINT

42.     The exterior of the Neuriva Plus packaging also advertises that it has "clinically proven natural ingredients" and claims that the supplement "Fuels 6 indicators of brain performance" and lists the following: "Focus," "Memory," "Learning," "Accuracy," "Concentration," and "Reasoning."



43.     The side of the Neuriva Plus packaging elaborates on what Defendants claim the supplement will do as a matter of fact, which is identical to the claim made on the side panel of the Neuriva Original packaging: "Our natural ingredients are GMO-free and clinically proven to enhance brain performance." Regarding the first main active ingredient, coffee cherry extract, Defendants again claim that it is "clinically proven to increase levels of the vital neuroprotein BDNF, known to strengthen connections between brain cells." Regarding the second main active ingredient, phosphatidylserine, Defendants again claim that "[t]hese plant-sourced phospholipids make up the structure of neurons within the brain. Clinically proven to aid neuron health and fuel

CLASS ACTION COMPLAINT

memory and learning ability." As with Neuriva Original, Defendants prominently display Neuriva's tagline on the Neuriva Plus label: "Nature made it. Science proved it. Brains love it." With respect to B6, B12, and Folic Acid, which Neuriva Plus also contains, Defendants claim they are "[k]ey nutrients to support brain health & cognitive function."

## Nature made it. Science proved it. Brains love it.

Our natural ingredients are GMO-free and clinically proven to enhance brain performance.* Disclaimer: **Neuriva®** won't make you a genius, but others might think you are.

 **NEUROFACTOR™ (COFFEE CHERRY)**
Made from the nutrient-rich fruit of the coffee cherry, this whole fruit extract is decaffeinated and clinically proven to increase levels of the vital neuroprotein BDNF, known to strengthen connections between brain cells.*

 **PLANT-SOURCED SHARP PS™ (PHOSPHATIDYLSERINE)**
These plant-sourced phospholipids make up the structure of neurons within the brain. Clinically proven to aid neuron health and fuel memory and learning ability.*

**VITAMINS B6, B12 & FOLIC ACID**
Key nutrients to support brain health & cognitive function*

 **Neuriva is:**
• Decaffeinated
• GMO-Free
• Vegetarian

44.    Through the representations on Defendants' exterior packaging, Defendants represent to consumers that Neuriva improves focus, memory, learning, accuracy, concentration

and, when they add vitamins B6, B12, and Folic Acid, reasoning. And Defendants further claim that Neuriva's efficacy is scientifically and clinically proven.

45.     Defendants repeat and expand on these deceptive representations on their website, www.SchiffVitamins.com. Their website includes the following representations, among others, concerning the Neuriva Products:

   a. "Our new supplement combines the best of science and nature to help brains brain better."

   b. "What makes our ingredients so special? Nature made it. Science proved it. Brains love it."

   c. "Our natural ingredients are decaffeinated, GMO-free, gluten-free, and clinically proven to support brain performance."

   d. "This extract is GMO-free and is decaffeinated, and it's been shown to have incredible brain-supporting properties."

   e. "We've studied this amazing superfruit [Coffee Cherry], and proven that it elevates the body's levels of the neuroprotein BDNF."

   f. "BDNF is vital neuroprotein that is known to strengthen connections between brain cells, and help new connections flourish."

46.     If a consumer decides to buy Neuriva Original or Neuriva Plus on the Schiff website and clicks on the product, the website then shows another summary of purported brain performance benefits, which includes the claim that "Coffee Cherry Extract has been clinically proven to increase BDNF levels in the brain."

14        CLASS ACTION COMPLAINT

47.   Defendants also encourage readers of their website to "visit our science & ingredients" webpage by asking: "What makes our ingredients so special?"



48.   Under the title "Natural Ingredients Proven Through Science," Defendants elaborate on their claims that Neuriva is scientifically proven through a series of rotating slides. After a person clicks on these slides, a pop-up window appears providing additional information:

a.   After clicking the slide entitled "Tale of Two Neurons," the pop-up window states: "Your brain consists of approximately 86 billion neurons. And it does its work by making connections between them. The two main ingredients in Neuriva have been shown to support both; PS$^{TM}$ supports neuronal health, and coffee cherry (Neurofactor) increases BDNF."

b.   After clicking the slide entitled "The Importance of BDNF," the pop-up window states: "[BDNF is] what your brain uses to strengthen connections between neurons, and has been clinically shown to play a role in cognitive performance and higher thinking. Maintaining higher levels of BDNF helps ensure maximum support for your brain."

c.   After clicking the slide entitled Coffee Cherry," the pop-up window states: "This extract is GMO-free and is decaffeinated, and it's been shown to have incredible brain-supporting properties. We call it Neurofactor. We've studied this amazing superfruit and proven that it elevates the body's levels of neuroprotein BDNF.

BDNF is a vital neuroprotein that is known to strengthen connections between brain cells, and help new connections flourish."

d.  After clicking the slide entitled "Plant-Sourced Sharp PS$^{TM}$," the pop-up window states: "Dietary trends show that PS$^{TM}$ intake from food and diet alone has declined over the years so PS$^{TM}$ supplementation is a great way to help support your brain and cognitive function! Our Sharp PS$^{TM}$ is sourced from soybeans and the subject of many clinical studies proving its effectiveness as a cognitive aid."

49.    Defendants also create and post videos on their dedicated YouTube.com channel, Neuriva Brain Performance, through which they market Neuriva. These videos are designed and intended by Defendants to communicate claims about Neuriva's brain performance capabilities.

50.    In the video entitled "What's in Neuriva? Discover our natural ingredients to support brain health," Defendants ask: "What's the not so secret secret behind Neuriva? Our amazing clinically proven natural ingredients." Defendants continue to discuss their "clinically proven" ingredients. Regarding "Neurofactor" (a brand name for coffee cherry extract), Defendants claim it "helps increase your brain's natural levels of BDNF, a key neuroprotein crucial to your overall brain health. Now what you really need to know is BDNF is known to support connections between brain cells and help new connections flourish." Regarding "Sharp PS" (phosphatidylserine), Defendants claim it is "clinically proven to support memory and learning. This is a no-brainer because lipids make up 60% of your brain and act as the main building blocks of cell membranes. Healthy lipids enrich the brain making PS key for health cognitive functions." Putting the ingredients together, Defendants claim that both active ingredients carry the imprimatur of science: "Neurofactor plus PS makes Neuriva an incredible brain support option. It combines the best of science and nature to help your brain be there for you when you need it most, and fuel key indicators of brain performance."

CLASS ACTION COMPLAINT

51.     Defendants have extensively advertised Neuriva on television.  A recent advertisement stated: "Do you want to brain better?  Unlike ordinary memory supplements, Neuriva has clinically proven ingredients that fuel five indicators of brain performance: memory, focus, accuracy, learning, and concentration.  Try Neuriva for 30 days and see the difference."

52.     Commercials have appeared on various popular networks.

53.     Defendants also actively post marketing claims to an Instagram account. For example, a March 17, 2020 post utilizes the Jeopardy game show to emphasize Defendants' claim that Neuriva is clinically proven.



54.     Another Instagram post by Defendants asked: "Did you know that nutrient-rich coffee cherry (or Neurofactor) is proven to increase levels of BDNF in the brain?

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15     55.     On   Twitter,   Defendants   claim,   among   other   claims:   "Let's   talk   about

16   Phosphatidylserine. Sharp PS, has been proven to support memory and learning in multiple clinical

17   studies."

18     56.     Defendants also include descriptions next to their videos to emphasize their central

19   uniform   marketing   message.   For   example,   Defendants   attempt   to   set   Neuriva   apart   from

20

21   competitors as a better supplement based on its "clinically proven" ingredients:

22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9

**neuriva** ✔ We're not your ordinary memory supplement! 💊 Neuriva's clinically proven ingredients work to fuel five indicators of 🧠 performance: focus, accuracy, memory, learning, and concentration.* Interested in how you can #BrainBetter? Check the link in our bio!

4w

10       57.    The singular message throughout Defendants' marketing of Neuriva is that Neuriva

11  is scientifically and clinically proven, as a matter of fact, to increase brain performance. This

12  overriding message promoted by Defendants has been and will continue to be read, heard, and

13  understood by consumers whether they see it on television; research the product online through

14  Defendants' website or through another website (such as YouTube or Instagram); or read the

15  Product packaging or labeling in a physical store, because this primary message is consistently

16  repeated by Defendants across all utilized media.

17

18      **Defendants' Representations are Deceptive and Misleading Because There is No Valid
Scientific or Clinical Evidence Supporting Defendants' Representations**

19

20      58.    In order for a claim to be considered scientifically and clinically proven, as

21  Defendants claim for Neuriva, the claim must be widely accepted in its applicable field and have

22  overwhelming evidence supporting it.  Moreover, there must be a consensus in the scientific

23  community agreeing with the representations. Such consensus would require, at a minimum,

24  sufficiently large, randomized, controlled, double-blind studies that have been scrutinized by peer

25  review during the publication process and subjected to scholarly debate by diverse panels of

26  scientific experts. Additionally, scientific consensus requires that published results be

27  independently replicated by others using rigorous experimental design and data collection practices.

28

19      CLASS ACTION COMPLAINT

If specific representations do not meet these standards, they cannot be considered to be "scientifically and clinically proven" nor can they be considered to have reached scientific consensus.[5]

59.     There is no scientific consensus or scientific or clinical evidence that Neuriva will result in enhanced or increased brain performance or will otherwise support brain performance in any way.

60.     Neuriva has two main active ingredients to which Defendants attribute its purported efficacy: coffee cherry extract and plant-sourced phosphatidylserine.

61.     Both versions of the active ingredients that Defendants use in Neuriva are brand-name versions. Defendants' supplier of coffee cherry extract has named the ingredient "Neurofactor," while Defendants' supplier of plant-sourced phosphatidylserine has named that ingredient "Sharp PS."

62.     In order to cause any improvement in brain performance, Neuriva must first be ingested. Then, its active ingredients must be absorbed into the bloodstream. From there, the active ingredients must circulate in the bloodstream, without being broken down, and ultimately cross the blood-brain barrier. Only after the active ingredients cross the blood-brain barrier can they potentially cause any improvement whatsoever to brain performance.

63.     As the Global Council on Brain Health has emphasized: "When researchers study prescription drugs that have an effect on the brain, a key experiment that they perform is measuring how much of the drug taken (orally or through other routes) gets into the brain.  Not all substances taken by mouth survive the strong stomach acid, and not all substances that persist beyond the

_____

[5] Bauchner H, Golub RM, Fontanarosa PB. Reporting and Interpretation of Randomized Clinical Trials. *JAMA*. 2019;322(8):732-735; Kirman CR, Simon TW, Hays SM. Science Peer Review for the 21st century: Assessing Scientific Consensus for Decision-making while Managing Conflict of Interests, Reviewer and Process Bias. *Regul Toxicol Pharmacol*. 2019;103:73-85.

CLASS ACTION COMPLAINT

stomach get absorbed into the blood.  Even after absorption into the blood, the liver can further break down the substance, and the blood-brain barrier – the natural gatekeeper of the brain – may keep out what is left.  Usually it is not known how much – if any – of the supplement people take gets into the brain."[6]  Consequently, "a key step in using science to support any supplement's benefit on brain health would be to study how much of each nutrient gets to the brain."[7]

64.     No valid scientific or clinical evidence exists regarding how much, if any, of Neuriva's key ingredients reaches the brain.  Because of this lack of evidence, Defendants' claims that Neuriva's ingredients are scientifically and clinically proven to benefit the brain are patently false, as well as are Defendants' claims that Neuriva is effective.

65.     Instead of presenting actual scientific and clinical evidence giving rise to a scientific consensus that coffee cherry extract and plant-based phosphatidylserine in fact impact brain performance, Defendants created a deceptive and misleading infographic on their website that sets out Defendants' essential claims and purported scientific support for Neuriva and its active ingredients but glosses over or misrepresents the lack of evidence that its active ingredients actually reach the brain or impact the function of the brain:[8]

---

[6] *Id.* at p. 20.
[7] *Id.*
[8] *See* https://www.schiffvitamins.com/blogs/health-wellness/ingredients-for-better-brain-health.

21                    CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

*No Scientific or Clinical Evidence Exists*
*That Coffee Cherry Extract Supports Brain Performance*

66.     According to Defendants, coffee cherry extract is one of the ingredients that "science proved," "is clinically proven to increase levels of Brain-Derived Neurotrophic Factor (BDNF)," and "is clinically proved to increase BDNF levels in the brain."[9] Also according to Defendants, "[BDNF] has been widely studied and is known to support the survival of existing neurons and encourage the growth of new neurons."[10]

67.     Defendants' claims that coffee cherry extract (or Neurofactor) is scientifically and clinically proven to improve brain performance and the implications in Defendant's infographic purporting to support those claims are deceptive and misleading because coffee cherry extract *does not* and *cannot* increase BDNF levels in the brain.

68.     Among other reasons that Defendants' claims are false, BDNF cannot cross the blood-brain barrier. Therefore, it is scientifically implausible that BDNF could survive circulation in the bloodstream and be transported across the blood-brain barrier in a quantity sufficient to provide any meaningful impact on brain performance.

69.     The blood-brain barrier acts as a sort of security system for the brain. The blood-brain barrier is highly selective and ensures that only specific substances are allowed to cross and gain access to brain tissue. There is no evidence, let alone scientific or clinical proof, that any increase of BDNF in the blood, such as may be caused by coffee cherry extract, will result in measurable BDNF transport across the human blood-brain barrier and, subsequently, increase the concentration of BDNF in brain tissue.

---

[9] *See* https://www.schiffvitamins.com/products/neuriva-original-brain-performance-clinically-proven-brain-supporting-supplement-with-natural-ingredients.
[10] *See id.*

70.     Consequently, there is no scientific or clinical evidence, let alone scientific or clinical proof, that coffee cherry extract that is orally ingested will increase BDNF in the brain and/or increase brain performance.

71.     In addition to their false claims regarding coffee cherry extract, Defendants intentionally mislead consumers by juxtaposing (a) assertions that clinical studies show that coffee cherry extract stimulates the production of BDNF and can increase BDNF levels in the plasma in 90 minutes with (b) statements such as "BDNF has an important role in maintaining the health of existing brain cells, inducing the growth of new neurons and synapses and **supporting overall cognitive function, including memory and learning.**" (Bold original) A reasonable consumer would erroneously understand this juxtaposition to mean that coffee cherry extract can improve cognitive functions by increasing levels of BDNF in the blood when there is no scientific or clinical evidence that increased plasma levels of BDNF can increase BDNF levels in the brain.

### *No Scientific or Clinical Proof That Plant-Based Phosphatidylserine Supports Brain Performance*

72.     Defendants' claims that their second active ingredient, plant-sourced phosphatidylserine, is scientifically and clinically proven to improve brain performance are also deceptive and misleading.

73.     First, no scientific consensus exists that there is clinical and scientific proof that the soy-derived phosphatidylserine in Neuriva will in fact positively affect brain functions. Defendants' claims—such as the one on their website that "PS has been heavily researched and is known to support **proper functioning of the nerve cells in the brain**" (bold original)—are misleading.  Soy-based phosphatidylserine, such as that used in Neuriva, has *not* been heavily researched, and it has *not* been scientifically established that soy-based phosphatidylserine benefits the brain.

74.     Defendants fail to disclose to consumers that the "heavily researched" form of phosphatidylserine is animal-derived phosphatidylserine, which is distinct from the soy-based phosphatidylserine present in Neuriva.     The molecular composition of soy-based phosphatidylserine, the ingredient contained in Neuriva, is different from the molecular composition of animal-derived phosphatidylserine, and research on animal-derived phosphatidylserine cannot support any claim that soy-based phosphatidylserine will improve brain performance.

75.     There is no consensus in the scientific community, based on the limited and inconclusive research to date, that soy-based phophatidylserine can improve brain performance generally,   much less "Focus," "Memory," "Learning," "Accuracy," "Concentration," and "Reasoning.".

76.     Defendants' assertion that the phosphatidylserine in Neuriva has been clinically proven to support memory and learning in multiple clinical studies is deceptive and misleading.

77.     The Global Council on Brain Health, after reviewing the scientific literature, has concluded: "There is not enough evidence for recommending the use of phosphatidylserine for brain health, mental functioning, or prevention or treatment of Alzheimer's disease."

78.     The United States Food and Drug Administration has taken the position that "there is little scientific evidence supporting [the] claim" that "[c]onsumption of phosphatidylserine may reduce the risk of cognitive dysfunction in the elderly." Further, it is the FDA's position that "there is little scientific evidence supporting [the] claim" that "[c]onsumption of phosphatidylserine may reduce the risk of dementia in the elderly."

79.     Even if there were evidence that soy-based phosphatidylserine in fact improves brain function, which there is not, there is no scientific consensus and clinical studies have not scientifically established that the amount of soy-based phosphatidylserine contained in Neuriva—

100mg—would be sufficient to provide any meaningful improvement in brain performance or that taking Neuriva for 30 days, as advertised, can make any difference in brain function.

### No Scientific or Clinical Evidence
### Exists of Neuriva's Effectiveness

80.    When a drug or supplement has more than one active ingredient, as Neuriva does, all active ingredients must be studied in conjunction with one another in order to determine whether the active ingredients in combination still provide the benefits stated in the specific claim or claims. This is important because the active ingredients may diminish each other's effectiveness or produce unexpected consequences.

81.    The FDA has emphasized that even if a manufacturer can point to a study substantiating its claims as to one ingredient contained in its supplement, "[m]anufacturers should be aware that other substances . . .  included in the dietary supplement product itself might also affect the dietary supplement's performance or the study results."[11]

82.    Neuriva has two active ingredients: coffee cherry extract and phosphatidylserine. There is no valid scientific or clinical evidence that these two active ingredients, when combined, improve brain function or are safe for concurrent consumption.

### Defendants' Citation to Studies Purportedly Supporting Their Product Claims are Deceptive and Misleading Statements

83.    On the Neuriva website, after repeatedly claiming that Neuriva's ingredients are scientifically and clinically proven, Defendants urge consumers "to do your research" and "[w]hen choosing a supplement, look for products that have science backing their ingredients."  Defendants then list the following five "[r]eferences" to scientific literature:[12]

---

[11] See https://www.fda.gov/regulatory-information/search-fda-guidance-documents/ guidance-industry-substantiation-dietary-supplement-claims-made-under-section-403r-6-federal-food.
[12] See https://www.schiffvitamins.com/blogs/health-wellness/ingredients-for-better-brain-health.

CLASS ACTION COMPLAINT

**References:**

[1]Reyes-Izquierdo, T., Argumedo, R., Shu C., Nemzer B., & Pietrzkowski, Z. (2013) Stimulatory Effect of Whole Coffee Fruit Concentrate Powder on Plasma Levels of Total and Exosomal Brain-Derived Neurotrophic Factor in Healthy

[2]Reyes-Izquierdo, T., Nemzer, B., Shu, C., Huynh, L., Argumedo, R., Keller, R., & Pietrzkowski, Z. (2013). Modulatory effect of coffee fruit extract on plasma levels of brain-derived neurotrophic factor in healthy subjects. British Journal of Nutrition, 110(3), 420-425.

[3]Brambilla, R., Cunha, C., & Thomas, K.L. (2019). A simple role of BNDF in learning and memory? Frontiers in Molecular Neuroscience, 3, 1.

[4]Crook T. Treatment of age-related decline in cognitive capacities The effects of phosphatidylserine. In: Katz, RM, Goldman, eds. Anti-Aging Medical Therapeutics, 1998:20-28.

[5]Kim, H. Y., Huang, B. X., & Spector, A. A. (2014). Phosphatidylserine in the brain: metabolism and function. Progress in lipid research, 56, 1-18.

84.    By citing to purportedly scientific and/or clinical literature, Defendants intend to communicate to consumers that Neuriva is scientifically and clinically proven by these five scientific references to support brain performance.  Defendants' implication that these references support their claims is deceptive and misleading

85.    The five cited references do not provide any scientific or clinical proof for Defendants' claims. Rather, these references directly undermine Defendants' claim that Neuriva is scientifically and clinically proven to improve brain function.

86.    First, Defendants cite to a 2013 study conducted by employees of the company that owns and sells Neurofactor (the coffee cherry extract) entitled "Stimulatory Effect of Whole Coffee Fruit Concentrate Powder on Plasma Levels of Total and Exosomal Brain-Derived Neurotrophic Factor in Healthy Subjects: An Acute Within-Subject Clinical Study."[13] The conclusion reached in this study was that "whole coffee fruit concentrate" increased BDNF in blood plasma. This study did not show any increase in BDNF in the brain or provide any evidence that BDNF in blood plasma

---

[13] *See*
https://www.researchgate.net/publication/260944035_Stimulatory_Effect_of_Whole_Coffee_Fruit_Concentrate_Powder_on_Plasma_Levels_of_Total_and_Exosomal_Brain-
Derived_Neurotrophic_Factor_in_Healthy_Subjects_An_Acute_Within-Subject_Clinical_Study

could cross the blood-brain barrier and achieve concentrations in brain tissue that could improve brain performance. The study also noted further research was necessary, which further shows that Defendants' claim that coffee cherry extract is scientifically and clinically "proven" is false.[14] Specifically, the studies' authors end the article with an explanation that "[f]urther studies are needed" and that "it would be interesting to study the effect of [whole coffee fruit concentrate] on BDNF-mediated brain functionalities such as cognitive activity...."[15]  In other words, the study itself acknowledged that it did not address whether coffee cherry extract affects brain performance. Accordingly, Defendants' citation of this study is deceptive and misleading.

87.     Second, Defendants cite to a 2013 study entitled "Modulatory effect of coffee fruit extract on plasma levels of brain-derived neurotrophic factor in healthy subjects," a study also conducted by employees of the company that markets Neurofactor.[16] The conclusion reached in this study was again only that "whole coffee fruit concentrate" increased BDNF in blood plasma. This study did not show any increase of BDNF in the brain or that an increase in blood plasma BDNF results in enhanced BDNF delivery across the blood-brain barrier. Furthermore, this study provided no data in support of the assertion that coffee fruit extract could provide beneficial effects in the brain due to elevated BDNF plasma levels. This study also noted the need for "larger clinical studies" simply "to support" a possibility that whole coffee fruit concentrate might be "used for modulation of BDNF-dependent health conditions," without any reference to the brain.

---

[14] *Id.*
[15] *Id.*
[16] *See*
 https://www.cambridge.org/core/services/aop-cambridge-core/content/view/8B291E8D053143AA5A8D33B65496B034/S0007114512005338a.pdf/modulatory_effect_of_coffee_fruit_extract_on_plasma_levels_of_brainderived_neurotrophic_factor_in_healthy_subjects.pdf.

88.     Third, Defendants cite to a 2019 literature review entitled "A simple role of BDNF in learning and memory?"[17] Far from supporting Defendants' claim that Neuriva's active ingredients when orally ingested are scientifically and clinically proven to improve brain performance, this review notes that "[l]ack of a precise knowledge about the mechanisms by which BDNF influences higher cognitive functions and complex behaviors may constitute a severe limitation in the possibility to devise BDNF-based therapeutics for human disorders of the CNS." Nothing in this recent review supports Defendants' claim that coffee cherry extract (or Neurofactor) can increase BDNF in the brain or affect brain performance.

89.     Fourth, Defendants cite to an article entitled "Treatment of age-related decline in cognitive capacities: The effects of phosphatidylserine" contained in a 1998 book that is now out of print. The results of this study have been described as controversial, involved phosphatidylserine dosages three times larger than contained in Neuriva, and looked at only at a limited population. This article does not support Defendants' claim that plant-derived phosphatidylserine is clinically proven to improve brain performance or that Neuriva can increase brain performance.

90.     Fifth, Defendants cite to a 2014 literature review entitled "Phosphatidylserine in the brain: metabolism and function."[18] This review establishes, contrary to Defendants' claims, that it is far from clear whether soy-based phosphatidylserine can increase brain performance: "[E]xperimental evidence indicating that orally or intravenously administered PS actually alters neuronal membrane properties is lacking. How the administered PS is transported in the plasma, how much enters the brain, whether it is taken up intact, and whether it is incorporated into neurons or glia are not known.... These issues will have to be investigated in order to obtain some mechanistic insight into how dietary or intravenously administered PS supplements function to

---

[17] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2821174/
[18] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4258547/

produce cognitive improvement."   This literature review shows that Defendants' claims of scientific and clinical proof regarding the ability of soy-based phosphatidylserine to affect brain performance are deceptive and misleading.

91.    The lack of scientific and clinical support for Defendants' claims regarding Neuriva is hardly surprising to anyone versed in the science. As the Global Council on Brain Health emphasized in a Consensus Statement: "Very few supplements have been carefully studied for their effect on brain health. For the handful that have been researched, several well-designed studies of supplements for brain health found no benefit in people with normal nutrient levels.  It's unclear whether people with nutritional deficiencies can benefit their brains by taking a supplement because the research is inconclusive."[19]

## Defendant RB's Chief Scientific Officer Admits
## Defendants' Marketing is Deceptive and Misleading

92.    Defendants' persistent and uniform marketing message is that Neuriva is scientifically and clinically proven to improve brain performance as a matter of fact. This message conveys to consumers that scientists have reached a consensus through clinical research that Neuriva's ingredients will improve consumers' brain performance. This message is deceptive and misleading as implicitly acknowledged by Defendant RB's Chief Scientific Officer, Dr. Dirk Hondmann.

93.    In Defendants' press release dated April 24, 2019,[20] Dr. Hondmann claims only that "Neuriva's ingredients are supported by clinical studies"—as opposed to being proven—and also acknowledges that the Products need more testing: "But this is just the beginning – the team is committed to continuing to advance the education and science even further."

---

[19] Global Council on Brain Health at p. 4.
[20] See https://www.prnewswire.com/news-releases/its-time-to-brain-better-rb-launches-neuriva-a-dietary-supplement-and-holistic-approach-to-support-brain-health-300837523.html.

CLASS ACTION COMPLAINT

94.     In addition, in an interview published on May 6, 2019, shortly after Defendants first began marketing Neuriva, Dr. Hondmann said with regard to Neuriva's ability to improve brain function: "There are several studies supporting the effectiveness of the ingredients in Neuriva. While both ingredients have similar mechanisms of action we are eager to continue to invest in clinical research of the individual components and investigate studies on the complete product."[21]

95.     Dr. Hondmann's more limited claim that there are only studies "supporting" the effectiveness of the ingredients in improving brain function is deceptive in and of itself and is also an acknowledgement that the effectiveness of the Neuriva ingredients has not yet been proven. Scientifically, the mere existence of studies "supporting" the effectiveness of an ingredient does not "prove" that the ingredient is effective, although this distinction is not readily apparent to the average consumer, particularly when bombarded with marketing and label claims of clinical and scientific proof.

96.     Dr. Hondmann further acknowledged that the effectiveness of the ingredients had not yet been proven—contrary to Defendants' uniform marketing claims—by stating that Defendants needed to fund further research on the ingredients.

97.     Dr. Hondmann also acknowledged that the effectiveness of Neuriva itself had not been proven—contrary to the implications of Defendants' uniform marketing claims—because clinical research needs to be done on Neuriva itself.

98.     By acknowledging the need for further research on Neuriva's core ingredients and on Neuriva itself, Defendant RB's Chief Scientific Officer admitted that Neuriva does not have the consensus of the scientific community necessary to state that Neuriva is scientifically or clinically "proven" to improve brain performance.

---

[21] *See* https://www.nutraingredients-usa.com/Article/2019/05/06/Reckitt-Benckiser-throws-hat-in-nootropic-ring-with-Neuriva-launch#.

CLASS ACTION COMPLAINT

**Impact of Defendants' Wrongful Conduct**

99.     As the manufacturer and distributor of Neuriva, Defendants possess exclusive and specialized knowledge regarding Neuriva's content and the effects of its ingredients as well as the state of scientific and clinical research regarding Neuriva's ingredients. As a result, Defendants are in a superior position to know whether Neuriva works as they claim in their marketing on the Products' packages and labels.

100.    Defendants knew, but failed to disclose, or should have known, that Neuriva is not scientifically or clinically proven to improve brain performance as advertised because Neuriva itself has not been studied.

101.    Defendants knew, but failed to disclose, or should have known that coffee cherry extract (or Neurofactor) has not been scientifically or clinically proven to improve brain performance and that even if orally-ingested coffee cherry extract increases levels of BDNF in the blood plasma, BDNF *cannot* cross the blood-brain barrier and impact brain performance.

102.    Defendants knew, but failed to disclose, or should have known, that soy-based phosphatidylserine is not scientifically or clinically proven to improve brain performance as advertised; that very little research has been done on soy-based phosphatidylserine; that soy-based phosphatidylserine is molecularly different than animal-derived phosphatidylserine; that the overwhelming bulk of the research has been done on animal-derived phosphatidylserine rather than soy-based phosphatidylserine; and that even if soy-based phosphatidylserine could have an impact on brain function, it would not show any brain impact within 30 days as advertised.

103.    Defendants knew, but failed to disclose, that their five references to scientific literature do not support, and in several cases directly refute, Defendants' assertions that Neuriva and its ingredients are scientifically and clinically proven.

CLASS ACTION COMPLAINT

104.    Defendants knew, but failed to disclose, that some of their cited studies are funded by those who have a direct financial incentive in producing positive results.

105.    Defendants affirmatively represented that there was scientific and clinical proof for Neuriva's improved brain performance claims when there is no scientific or clinical consensus regarding those claims.

106.    Plaintiff and the class members have been and will continue to be deceived or misled by Defendants' false, misleading, and deceptive brain performance representations.

107.    Defendants' brain impact representations and omissions were a material factor in influencing Plaintiff's and the class members' decision to purchase Neuriva. In fact, the only purpose for purchasing Neuriva is to obtain the represented brain performance benefits.

108.    Defendants market Neuriva solely for use as a supplement that improves brain performance. Defendants' conduct has injured Plaintiff and the class members because Defendants' Neuriva cannot support or benefit brain performance as advertised and is worthless.

109.    Had Plaintiff and the class members known the truth about Defendants' Neuriva products, they would not have purchased Neuriva and would not have paid the prices they paid for Neuriva.

110.    Plaintiff and each class member were harmed by purchasing Defendants' Neuriva because Neuriva is not capable of providing the claimed benefits to the brain. Plaintiff and each class member lost money and property as a result of purchasing Defendants' ineffective and worthless products.

111.    Plaintiff and each class member did not realize the benefit of the bargain and their expectations were not met.  And Plaintiff and each class member paid substantially more than the market value represented by the price bargained for.

CLASS ACTION COMPLAINT

112.    By use of its misleading marketing and labeling, Defendants created increased market demand for Neuriva and increased their market share relative to what the demand for Neuriva and share would have been had Defendants marketed and labeled Neuriva truthfully.

113.    Plaintiff and the class members lost money as a result of Defendants' misrepresentations in that they did not receive what they reasonably believed they were paying for based upon the misrepresentations while Defendants realized a commensurate unearned gain because they did not deliver to Plaintiff and the class members what Defendants led Plaintiff and the class members to believe they would receive.

**FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF**

114.    Plaintiff purchased Neuriva Plus on Amazon. Prior to purchasing Neuriva Plus, Plaintiff was exposed to and saw and relied upon Defendants' materially misleading representations via television commercials, the internet, the Neuriva website, on Amazon's website, and the Neuriva packaging, including Defendants' claims that Neuriva's ingredients have been clinically and scientifically proven and that Neuriva has the ability to improve brain performance.

115.    Plaintiff experienced no improvement in his brain performance as a result of taking Neuriva.

116.    Plaintiff's decision to buy Neuriva was directly impacted and caused by the materially misleading representations that Defendants made regarding Neuriva's ingredients being clinically and scientifically proven and Neuriva's ability to improve brain performance.

117.    Had Plaintiff known the truth about Defendants' materially misleading representations and omissions, he would not have purchased Neuriva.

118.    By purchasing Defendants' falsely advertised Products, Plaintiff suffered injury in fact and lost money.

CLASS ACTION COMPLAINT

**Class Action Allegations**

119.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a proposed National Class, Multi-State Class, and California Class defined as follows:

**National Class**

All persons residing in the United States who purchased Neuriva Original and/or Neuriva Plus for personal use and not for resale.

**Multi-State Class**

All persons residing in the states listed below who purchased Neuriva Original and/or Neuriva Plus for personal use and not for resale.

**California Class**

All persons residing in the state of California who purchased Neuriva Original and/or Neuriva Plus for personal use and not for resale.

120.    Excluded from the National Class, the Multi-State Class, the California Class (referred to collectively in this section as "the Class") are: Defendants, Defendants' board members, executive level officers, and attorneys, and immediate family members of any of the foregoing; governmental entities; the Court, the Court's immediate family, and staff; and any person who timely and properly excludes himself or herself from the Class.

121.    Plaintiff reserves the right to alter the Class definition as necessary to the full extent allowed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Eastern District of California, and applicable precedent.

122.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence that individual Class members would use to prove those elements in individual actions alleging the same claims.

CLASS ACTION COMPLAINT

*Numerosity, Rule 23(a)(1)*

123.    The size of the Class is so large that joinder of all Class members is impracticable. Plaintiff believes there are thousands or more members in the California Class geographically dispersed throughout the State of California and tens of thousands or more Nationwide and Multi-State Class members outside of California.

***Existence and Predominance of Common Questions of Law and Fact,***
***Rule 23(a)(2), (b)(3)***

124.    There are questions of law and fact common to the Class. These questions predominate over any questions that affect only individual Class members. Common legal and factual questions/issues include but are not limited to:

a.  what representations Defendants have made regarding Neuriva over time;

b.  the state of scientific and industry knowledge, including Defendants' knowledge, regarding the ability of coffee cherry extract and/or plant-based phosphatidylserine to improve brain performance;

c.  whether Neuriva has any of the beneficial effects on brain performance that Defendants claim;

d.  whether Neuriva is scientifically or clinically proven to have any of the beneficial effects on brain performance that Defendants claim;

e.  whether Defendants' representations and omissions regarding Neuriva are false and/or misleading;

f.  whether Defendants have engaged in false and/or misleading advertising, marketing, packaging, and labelling in connection with Neuriva;

g.  whether Defendants knew or reasonably should have known that their representations regarding Neuriva are false and misleading;

h.  whether Defendants' conduct was knowing and willful;

     i.   whether the Class members have been injured and the proper measure of their damages as a result of their injuries; and

     j.   whether the Class members are entitled to other appropriate remedies, including corrective advertising and injunctive relief.

125.    Defendants engaged in a common course of conduct in contravention of the laws Plaintiff seeks to enforce individually and on behalf of the Class members. Similar or identical violations of law, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate this action. Moreover, the common questions will yield common answers that will substantially advance the resolution of the case.

### *Typicality, Rule 23(a)(3)*

126.    Plaintiff's claims are typical of the claims of the Class members because, among other things, Defendants injured all Class members through the uniform misconduct described herein; all Class members suffered injury due to Defendants' misrepresentations; and Plaintiff seeks the same relief as the Class members.

127.    There are no defenses available to Defendants that are unique to the named Plaintiff.

### *Adequacy of Representation, Rule 23(a)(4)*

128.    Plaintiff is a fair and adequate representative of the Class because Plaintiff's interests do not conflict with the Class members' interests. Plaintiff will prosecute this action vigorously and is highly motivated to seek redress against Defendants. Furthermore, Plaintiff has retained competent counsel who are experienced in class action and other complex litigation. Plaintiff and Plaintiff's counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.  The interests of the Class members will be fairly and adequately protected by Plaintiff and his counsel.

     CLASS ACTION COMPLAINT

*Declaratory and Injunctive Relief, Rule 23(b)(2)*

129.     Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

*Superiority, Rule 23(b)(3):*

130.     The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for reasons including but not limited to the following:

a.   The damages individual Class members have suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' misconduct.

b.   It would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. Individualized litigation would unnecessarily increase the delay and expense to all parties and to the court system and presents a potential for inconsistent or contradictory rulings and judgments. By contrast, the class action device presents far fewer management difficulties, allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

c.   The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.

CLASS ACTION COMPLAINT

131.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications or that would substantively impair or impede their ability to protect their interests.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On behalf of Plaintiff individually and on behalf of the California Class)**

132.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

133.     Plaintiff and Defendants are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

134.     Defendants are subject to California's UCL, Cal Bus. Prof. Code § 17200 *et seq*. The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

135.     Defendants' business practices, described above, violated the "unlawful" prong of the UCL.   Because Defendants' representations about the Neuriva products were false and misleading, Defendants have committed unlawful business practices by violating California's Sherman Food, Drug and Cosmetic Law.   Cal. Health & Safety Code §§ 109875 *et seq.* and the Food Drug and Cosmetic Act, 21 U.S.C. §§ 301 *et seq*.

136.     Defendants violated the "unfair" prong of the UCL by making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding Neuriva in their marketing and on Neuriva's packaging and labeling, as set forth above. There is no societal benefit from false advertising—only harm.

39     CLASS ACTION COMPLAINT

137.     Plaintiff and the other Class members paid for a valueless product that is not capable of conferring the benefits promised. While Plaintiff and the other Class members were harmed, Defendants were unjustly enriched by their false representations and omissions. As a result, Defendants' conduct is "unfair" as it offended an established public policy. Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

138.     Further, Plaintiff alleges violations of consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers. Defendants' acts and omissions violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of the Business & Professions Code § 17200, *et seq.*

139.     Defendants violated the fraudulent prong of the UCL by, among other things, making the false representations and omissions of material facts regarding Neuriva in their uniform advertising, including the packaging and labeling, as set forth more fully herein. In fact, Neuriva is not capable of conferring the brain performance benefits Defendants promised and Defendants falsely claimed Neuriva was scientifically and clinically proven when Defendants have no such proof.

140.     Defendants' actions, claims, omissions, and misleading statements, as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200 *et seq.*

141.     Plaintiff and the members of the Class have in fact been deceived as a result of their reliance on Defendants' material misrepresentations and omissions, which are described above. Plaintiff and the Class acted reasonably when they purchased Neuriva based on their belief that Defendants' representations were true and lawful.

142.   Plaintiff and the Class members have suffered injury in fact and lost money as a result of their purchases of Defendants' Neuriva Products and Defendants' unlawful, unfair, and fraudulent practices.

143.   Defendants knew, or should have known, that they have no scientific evidence for their claims of definitive scientific and clinical proof as set forth above.  Defendants further knew, or should have known, that their material misrepresentations and omissions would be likely to deceive and harm the consuming public and result in consumers making payments to Defendants for Neuriva which is valueless and incapable of actually supporting, maintaining, improving, or benefiting brain performance.

144.   As a result of their deception, Defendants were unjustly enriched by receiving payments from Plaintiff and the Class for Neuriva when it cannot perform as advertised and when there is no scientific or clinical evidence to support Defendants' claims of definitive scientific and clinical "proof."

145.   Unless restrained and enjoined, Defendants will continue to engage in the unlawful, unfair, and fraudulent conduct described herein. Accordingly, injunctive relief is appropriate.

146.   Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, seeks restitution from Defendants of all money obtained from Plaintiff and the other members of the Class collected as a result of Defendants' unfair competition, an injunction prohibiting Defendants from continuing and further engaging in their unlawful, unfair, and fraudulent conduct, requiring corrective advertising, and awarding all other relief this Court deems appropriate.

1
2
3

**COUNT II**
**Violation of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750, *et seq*.**
**(On behalf of Plaintiff individually and on behalf of the California Class)**

4       147.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs

5   as if fully set forth herein.

6       148.    Plaintiff and California Class Members are consumers who purchased Neuriva for

7   personal, family, or household purposes.  Plaintiff and the Class have been at all relevant times

8
9   "consumers" within the meaning of the CLRA, Cal. Civ. Code § 1761(a), (c), and (d).

10      149.    Defendants are "persons" and Neuriva Products are "goods" within the meaning of

11  the CLRA, Cal. Civ. Code § 1761(a), (c), and (d).

12      150.    Defendants' sale and advertisement of Neuriva constitute "transactions" within the

13  meaning of the CLRA, Cal. Civ. Code § 1761(e).

14      151.    The CLRA declares as unlawful the following unfair methods of competition and

15  unfair or deceptive acts or practices when undertaken by any person in a transaction intended to

16  result, or which results in the sale of goods to any consumer:

17

18          a.   "Representing that goods . . . have . . . approval, characteristics, . . . uses [and]

19               benefits . . . which [they do] not have . . . ."  Cal. Civ. Code § 1770(a)(5).

20          b.   "Representing that goods . . . are of a particular standard, quality or grade . . . if they

21               are of another."  *Id.* (a)(7).

22          c.   "Advertising goods . . . with intent not to sell them as advertised."  *Id.* (a)(9).

23
24          d.   "Representing that [goods] have been supplied in accordance with a previous

25               representation when [they have] not."  *Id.* (a)(16).

26      152.    Defendants violated and continue to violate the CLRA by engaging in the practices

27  prohibited by Cal. Civ. Code § 1770(a)(5), (7), (9), and (16), which were intended to result in, and

28  did result in, the sale of Neuriva.

153.   Defendants' foregoing acts and practices, including their deceptive and fraudulent misrepresentations and omissions in the conduct of trade or commerce, were directed at consumers, including Plaintiff and California Class Members.

154.   Defendants' violations of the CLRA proximately caused injury in fact to Plaintiff and the Class.

155.   Plaintiff and the Class members purchased Defendants' Neuriva on the belief that they would receive the advertised benefits to the brain from Neuriva.  Indeed, no consumer would purchase a brain health supplement unless he or she believed it was capable of providing meaningful benefits to the brain.

156.   Defendants' Neuriva, however, is worthless and cannot provide the advertised benefits. Because Neuriva lacks any value, Plaintiff and each Class member was injured by the mere fact of their purchase.

157.   Pursuant to Cal. Civ. Code § 1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above-described wrongful acts and practices of Defendants.

158.   Pursuant to Cal. Civ. Code 1782(a), Plaintiff has notified Defendants in writing sent by certified mail of the particular violations of Section 1770 of the CLRA, which notification demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act.  If Defendants fail to take corrective action within 30 days of receipt of Plaintiff's letter, Plaintiff will amend this complaint to include a request for damages as permitted by Cal. Civ. Code § 1782(d).

159.   Pursuant to § 1780(d) of the Act, attached hereto as Exhibit A is the affidavit showing that this action has been commenced in the proper forum.

**COUNT III**
**Violation of the California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500,** *et seq.*
**(On behalf of Plaintiff individually and on behalf of the California Class)**

160.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

161.    The FAL, in relevant party, states that "[i]t is unlawful for ... any corporation ... with intent ... to dispose of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper, or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known or which by the exercise of reasonable care should be known, to be untrue or misleading[.]" Cal. Bus. & Prof. Code § 17500.

162.    The required intent is the intent to dispose of property, not the intent to mislead the public in the disposition of such property.

163.    Defendants violated the FAL by making the untrue or misleading representations described above, including that Neuriva delivers the benefits Defendants claim and that its ability to deliver such benefits has been scientifically and clinically proven when, in reality, no scientific and clinical proof of Neuriva's advertised benefits exists.

164.    As a direct and proximate result of Defendants' untrue and misleading advertising, Plaintiff and the Class members have suffered injury in fact and have lost money.

165.    Accordingly, Plaintiff requests that the Court order Defendants to restore the money Defendants have received from Plaintiff and members of the Class, and that the Court enjoin Defendants from continuing their unlawful practices, and engage in corrective advertising.

**Count IV**
**Unjust Enrichment**
**(On behalf of Plaintiff individually and behalf of the Nationwide Class and/or California Class and/or the Multi-State Class)**

166.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

167.   Plaintiff and Class Members conferred a monetary benefit on Defendants when they purchased Neuriva.

168.   By their wrongful acts and omissions described within this Complaint, including the deceptive marketing, packaging, labeling, distribution, and sale of the Neuriva Products as scientifically and clinically proven to improve brain performance, Defendants were unjustly enriched at the expense of Plaintiff and Class Members.

169.   Plaintiff and Class Members' detriment and Defendants' enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

170.   Defendants have profited from their unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and Class Members under circumstances in which it would be unjust for Defendants to be permitted to retain the benefit. It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with the deceptive marketing, packaging, labeling, distribution, and sale of Neuriva.

171.   Plaintiff and Class Members have been damaged as a direct and proximate result of Defendants' unjust enrichment because they would not have purchased Neuriva had they known that it was not scientifically and clinically proven to improve brain performance.

172.   Defendants knew and intended that Plaintiff and Class Members would make payments for Neuriva based on the belief that Neuriva was scientifically and clinically proven to improve brain performance, as represented by Defendants in advertising and marketing, on

Defendants' website, and on the labels and packaging. It is inequitable for Defendants to retain the benefit of payments obtained through false and misleading representations.

173.    Plaintiff and Class Members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants.

174.    When required, Plaintiff and Class Members are in privity with Defendants because Defendants' sale of Neuriva was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendants' agents for the purpose of the sale of Neuriva.

175.    As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiff and Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants for their inequitable and unlawful conduct.

**COUNT V**
**Violation of Various Consumer Protection Laws**
**(On Behalf of the Multi-State Class)**

176.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

177.    Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in their marketing, advertising, and labeling of Neuriva.

178.    Had Defendants not engaged in the false and deceptive conduct described above, Plaintiff and the Class members would not have purchased Neuriva.

179.    Defendants' false and deceptive representations and material omissions to consumers and the public, including Plaintiff, constituted unfair and deceptive acts and practices in violation of the state consumer protection statutes listed below:

a. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, et seq.;

b. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, et seq.;

c. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, et seq.;

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, et seq.;

e. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 2-1 10a, et seq.;

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code §§ 2511, et seq. and 2531, et seq.

g. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, et seq.;

h. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201 et seq.;

i. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480-1, et seq.;

j. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq.;

k. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS §505/1, et seq.;

l. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, et seq.;

CLASS ACTION COMPLAINT

m. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.170, et seq.;

n. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, et seq.;

o. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, et seq.;

p. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws Ann. § 445.90 1, et seq.;

q. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 325D.43, et seq.; 325 F.67, et seq.; and 325F.68 et seq.;

r. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Ann. Missouri Stat. § 407.010, et seq.;

s. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MT Code § 30-14-101 et seq.;

t. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, et seq.;

u. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. Ann. § 598.0903, et seq.;

v. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, et seq.;

w. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Rev. Stat. § 56:8-1, et seq.;

CLASS ACTION COMPLAINT

x.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, et seq.;

y.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 et seq. and 350-e, et seq.;

z.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code §§ 51-12-01, et seq., and 51-15-01, et seq.;

aa. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. § 15 751, et seq.;

bb. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 6464.605, et seq.;

cc. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, et seq.;

dd. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, et seq.;

ee. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, et seq.;

ff. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, et seq.;

gg. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code Ann. § 47-18-101, et seq.;

hh. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, et seq.;

ii. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451, et seq.;

jj. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, et seq.;

kk. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code. § 19.86.010, et seq.; and

ll. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, et seq.[22]

180.   Plaintiff and members of the Class reasonably relied upon Defendants' misrepresentations and/or omissions in buying Neuriva.

181.   Plaintiff will provide any required notice to appropriate entities regarding Defendants' unfair and deceptive trade practices.

182.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class are entitled to compensatory damages, treble damages, attorneys' fees and the costs of this suit.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims in this Complaint so triable.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully request that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

---

[22] After satisfaction of their respective notice requirements, Plaintiff may seek permission to add claims, under Count V, for violation of the consumer protection laws of the following states: Alabama, Georgia, Indiana, Maine, Massachusetts, Texas, West Virginia and Wyoming.

CLASS ACTION COMPLAINT

1. Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as class representative, and appointing the undersigned counsel as class counsel;

2. Ordering restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiff and the Class members as a result of Defendants' unlawful, unfair, and fraudulent business practices;

3. Ordering injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign;

4.  Ordering damages for Plaintiff and the Class members;

5. Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and other members of the Class;

6. Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

7. Ordering such other and further relief as may be just and proper.

Dated: June 19, 2020     Respectfully submitted,

          By: /s/Alex R. Straus_____
             Alex R. Straus (SBN 321366)
             **GREG COLEMAN LAW PC**
             16748 McCormick Street
             Los Angeles, CA 91436
             T: 917-471-1894
             alex@gregcolemanlaw.com

             Adam A. Edwards*
             Rachel Soffin*
             Jonathan B. Cohen*
             William A. Ladnier (SBN 330334)
             **GREG COLEMAN LAW PC**
             First Tennessee Plaza

  CLASS ACTION COMPLAINT

800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile: (865) 522-0049
adam@gregcolemanlaw.com
rachel@gregcolemanlaw.com
jonathan@gregcolemanlaw.com
will@gregcolemanlaw.com

Daniel K. Bryson*
Martha A. Geer*
Patrick M. Wallace*
**WHITFIELD BRYSON LLP**
900 West Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: 919-600-5035
dan@whitfieldbryson.com
martha@whitfieldbryson.com
pat@whitfieldbryson.com

Matthew D. Schultz*
**LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY &
PROCTOR, PA**
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7140
Facsimile: (850) 436-6140
mschultz@levinlaw.com

Nick Suciu*
**BARBAT, MANSOUR, & SUCIU PLLC**
1644 Bracken Rd.
Bloomfield Hills, MI 48302
Telephone:(313) 303-3472
nicksuciu@bmslawyers.com

*Applications *pro hac vice* to be submitted

***Attorneys for Plaintiff and the Class***

CLASS ACTION COMPLAINT